**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS, EL PASO DIVISION**

| | | |
|---|---|---|
| **VIVEK DUGGAL AND NEERU DUGGAL INDIVIDUALLY AND AS SUCCESSORS IN INTEREST TO VAIBHAV DUGGAL, VIVEK DUGGAL AS ADMINSTRATOR OF ESTATE OF VAIBHAV DUGGAL** ***Plaintiffs*****,** | § § § § § § | **Civil Action No. 3:26-cv-575** **(State Cause No 2026DCV0483)** |
| | § § | |
| **V.** | § § | |
| **TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER EL PASO; RICHARD LANGE INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS PRESIDENT OF TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER EL PASO; RICHARD LANGE IN HIS OFFICIAL CAPACITY AS DEAN OF THE SCHOOL OF MEDICINE AT TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER EL PASO, CHARMAINE MARTINS, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS ASSOCIATE DEAN OF STUDENT AFFAIRS, SIREESHA REDDY IN HER OFFICIAL CAPACITY AS CHAIR OF OB/GYN CLINIC EUGENE TOY INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS VICE CHAIR OF OB/GYN CLINIC, KATELYN WELSHANS INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS DIRECTOR OF OB/GYN CLINIC AND DIRECTOR OF CLERKSHIP, TALIA RAYA IN HER OFFCICIAL CAPACITY AS DIRECTOR OF BUSINESS OPERATIONS, SAMANTHA BELLETETE, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS SENIOR ADMIN, MAUREEN FRANCIS INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS ASSOCIATE DEAN FOR MEDICAL EDUCATION** ***DEFENDANTS*** | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |

# PLAINTIFF'S SECOND AMENDED ORIGINAL PETITION

**COME NOW Plaintiffs VIVEK DUGGAL and NEERU DUGGAL in their personal capacity and as successors in the Estate of Vaibhav Duggal, Deceased, ("Decedent") file this Original Petition against Defendants Texas Tech University Health Sciences Center El Paso and their various employees and officers as described below in their official and individual capacities. Plaintiffs seek declaratory and prospective injunctive relief under the laws of the State of Texas against individual Defendants in their official capacities for actions taken in violation of Texas state law without legal authority, including but not limited to:**

a. Imposing disciplinary sanctions without conducting the mandatory investigation required by TTUHSC policies;

b. Suspending a medical student from clinical rotations without notice, investigation, or hearing;

c. Referring Vaibhav Duggal for "egregious" misconduct without factual basis or compliance with governing procedures;

d. Acting in direct contravention of TTUHSC's Institutional Handbook, Ambulatory Clinic Policy EP 6.6, and Grading, Promotion, and Academic Standing policies.

Plaintiffs also seek expunction of any and all wrongful accusations and unlawful disciplinary action against him by TTUHSC.

## I. DISCOVERY CONTROL PLAN

1. Plaintiffs seek discovery under Level 3 of the Texas Rules Civil Procedure and ask that

the Court issue a docket control order.

## II. AMOUNT IN CONTROVERSY, JURISDICTION & VENUE

2. The damages sought by Plaintiff are within the jurisdictional limits of the court.

3. The plaintiffs seek monetary relief in excess of $30,000,000.00 and non-monetary relief. Plaintiffs seek all damages against Defendants in their official capacity and/or individual capacity, but do not seek double recovery.

4. The Texas State District Court has subject matter jurisdiction because the amount in controversy and the damages sought are within the jurisdictional limits of this Court.

5. Venue is proper in Texas State District Court and El Paso county because: (1) it is the county in which all or a substantial part of the events giving rise to Plaintiff's claims occurred and/or (2) the property rights, subject of this dispute, is located in El Paso County, Texas.

6. Plaintiffs assert that there is Express waiver of immunity for declaratory relief.

7. This Amendment Removes all United States statutes. No relief is sought herein under federal law

## PARTIES

8. Plaintiff Vivek Duggal and Neeru Duggal in their personal capacity and as successors in the Estate of Vaibhav Duggal, Deceased, ("Decedent"). Decedent was a 3rd year medical student at Texas Tech University Health Sciences Center El Paso.

9. Plaintiff Vivek Duggal is the administrator of the Estate of Vaibhav Duggal and makes his appearance herein.

10. The Defendant, President and Fellows of Texas Tech University Health Sciences

Center El Paso ("TTUHSC El Paso" or "TTUHSC"). Defendant TTUHSC El Paso is an institution focused on the health and sciences with a principal location in El Paso, Texas and can be served through Office of General Counsel, Texas Tech University System, MSC11006, 130 Rick Francis St. El Paso, Texas 79905.

11. The Defendant, Richard Lange, M.D. is the President of TTUHSC El Paso and can be served at his place of work through Office of General Counsel, Texas Tech University System, MSC11006, 130 Rick Francis St. El Paso, Texas 79905.

12. The Defendant, Sireesha Reddy, M.D. is the Chair of Department for Obstetrics and Gynecology at TTUHSC El Paso and can be served through her place of work at TTUHSC El Paso through Office of General Counsel, Texas Tech University System, MSC11006, 130 Rick Francis St. El Paso, Texas 79905.

13. The Defendant, Katelyn Welshans, M.D. is a Texas Tech Physician and Associate Director of Obstetrics and Gynecology at El Paso and Director of Clinical Clerkship at Obstetrics and Gynecology clinic at TTUHSC El Paso and can be served through her place of work at TTUHSC El Paso through Office of General Counsel, Texas Tech University System, MSC11006 , 130 Rick Francis St. El Paso, Texas 79905.

14. The Defendant, Charmaine A. Martin, M.D. is the Associate Dean for Student Affairs at TTUHSC El Paso and can be served through her place of work at TTUHSC El Paso through Office of General Counsel, Texas Tech University System, MSC11006, 130 Rick Francis St. El Paso, Texas 79905.

15. The Defendant, Talia Raya is Director of Business Operations at TTUHSC El Paso and can be served through her place of work at TTUHSC El Paso through Office of General

Counsel, Texas Tech University System, MSC11006, 130 Rick Francis St. El Paso, Texas 79905.

16. The Defendant, Samantha Belletete is a Senior Admin at TTUHSC El Paso and can be served through her place of work at TTUHSC El Paso through Office of General Counsel, Texas Tech University System, MSC11006, 130 Rick Francis St. El Paso, Texas 79905.

17. The Defendant, Maureen Francis is Associate Dean for Medical Education at TTUHSC El Paso and can be served through her place of work at TTUHSC El Paso through Office of General Counsel, Texas Tech University System, MSC11006, 130 Rick Francis St. El Paso, Texas 79905.

18. The Defendant Eugene Toy is Vice Chair Obstetrics and Gynecology clinic at TTUHSC El Paso and can be served through his place of work at TTUHSC El Paso through Office of General Counsel, Texas Tech University System, MSC11006, 130 Rick Francis St. El Paso, Texas 79905

**APPLICABLE LAW**

19. This petition specifically alleges only Texas state law claims and does not make any claims under federal law.

20. Plaintiffs expressly disclaim any cause of action arising under federal law. Any reference to federal authorities is made solely for persuasive or interpretive purposes and does not form an independent basis for relief.

**SUMMARY OF THE CASE**

21. This case arises from a mandatory clinical rotation controlled entirely by a Texas state

medical school and the arbitrary disciplinary actions that followed a single, alleged uninvestigated patient grievance. Within days of the alleged grievance—without any meaningful investigation, without notice of specific charges, and without an opportunity to be heard—Vaibhav Duggal was removed from his clinical rotations and warned that his medical career was in jeopardy. The intentional, purposeful and punitive actions and communications that followed, undertaken by Defendants most of whom are trained medical professionals with authority over his education and future, created an acute and foreseeable mental health crisis that culminated in his death. Defendants, individually and in their official capacities wrongfully breached their duty to Vaibhav Duggal, who was in their charge for training as a medical student, denied him any semblance of due course of law under Article I, § 19 of the Texas Constitution before depriving him of his constitutionally protected interest in his education, and inflicted unimaginable emotional distress on Vaibhav and his bereaving parents and breached their implied contract with them. Defendants suspended Vaibhav without providing the notice, investigation and hearing procedures expressly required by the Feedback, TTUHSC's Complaint and Grievance Procedures of the Ambulatory Clinic Policy and procedure (Exhibit 1 EP 6.6, Grievances, Paragraph 3, Investigation Process) and the Institutional Handbook, Part II F(1)-(4) (Exhibit 2). The story of Vaibhav Duggal as outlined below, is not one our society can afford to repeat.

**FACTS**

22. Vaibhav Duggal (Vaibhav)– was an exceptionally gifted young man, enrolled in Texas

Tech University Health Sciences Center El Paso (TTUHSC) as medical student.

23. Academically gifted, Vibhav was a bright young man that aspired to be a doctor for most of his conscious life, even as a child his life purpose was to become a doctor.

24. Born on July 23, 2001, in Dallas, Texas on to proud parents Neeru and Vivek Duggal.

25. His interest in pursuing medical education started at a very young age of 8 in elementary school where he would dress up as a doctor or career days.

26. During his Middle and High School, he put in numerous volunteer hours at various medical facilities; Methodist Hospital, Doctors Clinics during his school holidays and attended various events related to be a Future Physician.

27. After finishing high school at Shadow Creek High School in top 3% of his class, this bright young man went on to Texas A&M University to study biology and neuroscience on the path to his medical education and graduated Summa Cum Laude with a GPA of 4.0/4.0.

28. Vaibhav scored 515[1] in his Medical College Admission Texas (MCAT) in his very first attempt and applied to multiple medical schools and was pursued by many of them as a stellar prospect.

29. None of the schools pursued Vaibhav more aggressively than Texas Tech University Health Sciences at El Paso (TTHSC El Paso) which offered him admission well before the deadlines for decision, in October of 2022.

---

[1] A 515 score in MCAT, out of a maximum of 528 places a student in 90-91st percentile of MCAT test takers, indicating that the student performed better than 90% of other students that took the exam. When combined with the fact that average GPA of MCAT test takers is 3.66, it highlights the fact Vaibhav scored in top 10% of the top 25-35%, thus in top 2-3% of all college graduates

30. To entice him further to attend TTUHSC El Paso, the college offered him a scholarship of $60,000.00

31. Impressed and enticed by their interest in him, Vaibhav abandoned all his other applications and committed to attend TTHSC El Paso.

32. Vaibhav started his journey in the medical school campus in TTUHSC on July 5th, 2023.

33. Once admitted, Vaibhav maintained good academic standing throughout his tenure at the college.

34. At the end of his First Year, he enrolled himself in Preceptorships in Internal Medicine and Pediatrics and got $6,000.00 Stipend from the State of Texas.

35. The medical school curriculum is organized where part of the education is in traditional classroom setting, where students attend lectures and labs, and after approximately two years of classroom education, rest of the education is in clinics.

36. This clinical rotation is thus an essential part of the medical school education, and for most third year and fourth year students, it is the primary mode of instruction in the medical school.

37. Students are assigned to clinics by the college, where they learn, hands-on, under the supervision of other doctors.

38. A group of students is thus assigned to one senior practicing doctor, usually referred to as the "attending physician", who then has some number of residents (which are themselves receiving training as part of the residency, but have graduated the medical school) and a varying number of students who are also receiving training.

Since neither the students nor the residents are officially licensed to provide care, patients are officially under the care of the attending physician who is assisted by the residents. Students usually only observe, but in some cases are allowed to participate under supervision of the practiced doctors.

39. Students thus go through clinical rotations in most of their third and fourth years of medical school education and generally do not have any in class instructions.

40. For the week of July 21st, Vaibhav was assigned to ambulatory OB/GYN clinics as part of his rotations.

41. Based on information provided by clinic's manager, Sherry Oldfield, it had become a regular practice for the clinic to save on paid man-hours to use students for certain portions of medical practice, diagnosis, and treatment (Exhibit 3a, Emailed letter from Sherry Odfield, Manager at OB/GYN Clinic).

42. One such area to save on man hours is a patient interview where it had become common practice to put students in an unsafe position with a patient. This is an especially dangerous position for a clinic to place a male student in, because the nature of exam and topic of questions is women's OBGYN, which is defined as a "sensitive" exam requiring direct supervision.

43. On July 23, 2025, during his OB/GYN clinical rotation Vaibhav along with a Nurse Practitioner (NP) was assigned to a patient that had scheduled a pelvic exam. Available information indicates that a "pap-smear" and "STD Screen" were to be conducted, Vaibhav completed the required interview of a patient prior to her

examination and went through the prescribed process for gathering medical and clinical history.

44. During the interview with Vaibhav, the female patient appeared to be a little nervous but oddly friendly with Vaibhav and spoke to him about her personal life and shared with him pictures of her family and other personal details of her life outside the lines of the interview questions. Available information indicates that patient indicated to him that she had a jealous boyfriend (Exhibit 9, pg. 3) and showed him a picture of her boyfriend. In response to this situation, Vaibhav tried to just be accommodating, as students are never trained or inadequately trained to know that this sort of over-friendliness by patients is inappropriate, or what they should do in such situations (see Exhibit 3a, statement by Sherry Oldfield, pg 3), and he showed her a picture of his girlfriend. During the course of the conversation, the patient indicated she is a nurse herself.

45. The clinical protocol required Vaibhav to ask the patient numerous intimately personal questions, including inquiring about sexual history and whether or not the patient engages in sexual activity with more than one partner. (Exhibit 16)

46. Since the patient had indicated she had a jealous boyfriend, Vaibhav, apparently to ease the patient's concerns, asked if her boyfriend would get mad if he touched her abdomen or did the exam.

47. The interview was to be followed by the physical exam, and the Patient declined to be examined by a student, and a Nurse Practitioner (NP) conducted the examination.

48. Available information also indicates that Nurse Practitioner also offered to the patient a choice that student (Vaibhav) did not have to be in the room for the exam. Nonetheless, the Patient did consent to Vaibhav being present in the room for the examination.

49. During the interaction but before leaving the Ob/Gyn clinic, the Patient voluntarily exchanged Instagram handles with Vaibhav inviting him to follow her on Instagram as she was leaving, since as fellow practitioners in medicine they might run into each other again, so Vaibhav sent her a follow request. Later, upon considering that even though she was a nurse, she came in as a patient and exchanging Instagram handles may be against school policy, although still unclear, Vaibhav in an abundance of caution, blocked her on Instagram approximately one hour after he sent his request.

50. The clinical documentation does not reflect that any part of the communication or interview was unprofessional or inappropriate. The evaluation form filled out by the same NP, Alejandra Cabral evaluating Vaibhav for the same day, July 23, 2025 in the same clinic, indicates that Vaibhav exceeded expectations for all eight categories evaluated, including Professionalism (No 6 on the form), and she additionally identified his strongest areas as "came prepared, engaged in learning" ( *see* Exhibit 6, OB Clerkship Student Evaluation Card).

51. About four (4) hours after she was blocked on Instagram by Vaibhav, the patient communicated with Samantha Belletete, a Senior Administrative Assistant in

Clinical Operations [2] via phone, asserting that she was uncomfortable with Vaibhav's questions during the intake, but she nonetheless authorized the student (Vaibhav) to remain in the room and observe the exam conducted by the nurse practitioner assigned to the clinic. The Patient requested that the student (Vaibhav) not be present during her follow up visit and not make any contact with her, even though she acknowledged that Vaibhav had already blocked her from communicating with him through Instagram.

52. The administrative assistant then appears to have triggered the grievance process requiring the Clinic director to respond by July 30th on a form included in the e-mail to Eugene Toy (Exhibit 7, pg 4). On July 28, 2025 five days after the grievance was triggered by communication from the patient against the clinic, Vaibhav was called into a meeting with Associate Dean Dr. Charmaine Martins (the "Dean") at around 2:45 pm.

53. It is noteworthy that no investigation of any kind was done by the defendants to validate or investigate the contents of the grievance as required by the "Investigation Process" identified in pg. 2 of Exhibit 1. The people most closely involved with the clinic and its operation, the manager of the clinic and the director of the clinic were left out of the loop (Exhibit 3a, Email from Sherry Odfield, Exhibit 4, E-Mail from Katelyn Welshans on 7/25/25 at 6:35pm, two days after the incident, professing she knows very little and seeking guidance from Martins and Francis).

---

[2] It is unclear without discovery how or why the office of Clinical Operations was engaged in this process, when the designated department for Patient Concerns or grievances is either the clinic itself or the Office of Clinical Affairs

54. Vaibhav was not interviewed by anyone in the clinic management or administration as required the "Investigation Process" defined in pg 2 of the Feedback, Complaint and Grievance Procedure, Exhibit 1. The Nurse Practitioner, Alejandra Cabral, who did the patient's pelvic exam, was instructed to not communicate with anyone, including her immediate direct supervisor.

55. There is no record that any person, supervisor, manager or practitioner in the clinic observed or noted any action on part of Vaibhav or distress by the patient that was of any concern.

56. In fact, the only feedback available about Vaibhav from the OB/GYN clinic that day is evaluation from the clinic of his performance, which was marked "excels in professionalism" , which is the same evaluation he received in all his clinics.

57. The grievance of "feeling uncomfortable" in an initial intake in a clinic, and an unsubstantiated claim of Instagram messages that generated uncomfortableness, without any actual messages or even their content produced, was taken as very serious accusation by the Director of Quality Improvement, Talia Raya, who also stated "I am copying risk management", while at the same time professing a complete lack of consistency in even basic facts "In the medical record we have no mention of the student being in the examination. Dr. Toy can you please ask NP Alejandra Cabral if there was a student present in the examination" (Exhibit 5, email from Director of Quality Improvement Talia Raya). The Vice-Chair of the clinic stated, "we are awaiting guidance from Title IX folks" (Exhibit 8) without identifying any basis or reason for engaging with "Title IX folks".

58. Two days later, on July 25, 2025, at 6:35pm the Director of Clerkship and the OB/GYN Clinic Dr. Katelyn Welshans wrote an email to two associate deans, Dr. Maureen Francis and Dr. Charmaine Martins, admitting that she was just finding about this "student issue" in the clinic stemming from a "patient concern". She indicated that "this has been escalated far above her " and only found out about it the same day (Friday), seeking guidance on what she needed to do or what documentation she needed to do. She did not raise a concern or communicate an issue, she was simply catching up and trying to understand if she needed to do anything to paper an assumed issue of already escalated above her head (Exhibit 4, Email from Welshans).

59. Dr. Welshans was subsequently informed by Dr. Maureen Francis, Associate Dean of Medical Education, that Dr. Martins had been working on this, and that she will need a formal referral to the GPC for an "egregious" breach of professionalism, and they are talking about removing the student from patient care while awaiting the GPC (Exhibit 4).

60. This "patient concern" now transformed into an "egregious breach of professionalism" was thus duly reported by Dr. Welshans as agreed and directed by Dr. Martins back to Dr. Martins on Monday morning at 10:26 am, so that Dr. Martins could claim she had just received a complaint against Vaibhav on Monday, both to Vaibhav, and subsequently to his parents when they tried to find out what happened, without ever disclosing that this was a pre-ordained outcome, directed by herself

through Dr. Welshans, who was willing to comply with the direction, and write the e-mail on Monday as if it originated from her.

61. Dr. Welshans, without any direct or prior knowledge of the incident, and without any investigation or even basic inquiry that the stated allegations had any substance, went on to refer Vaibhav for an "egregious violation" of "professionalism" even though clinic had evaluated him as "Excels in professionalism" the same day (Exhibit 4, Welshans Email and Exhibit 6, Vaibhav Evaluation).

62. Tellingly, in the same referral email (Exhibit 4), Welshans did admit that she had not had any opportunity to "speak with the student" "due to clinical obligations", "but did not want to delay the GPC referral process"

63. There was simply no assessment by her that a GPC referral was even warranted, she was just willing to comply with an executive decision made without access to any facts.

64. Vaibhav had just taken his SHELF[3] exam for OB/GYN Clerkship on the morning of the 28th July after studying hard throughout the weekend for it.

65. In the meeting on the 28th afternoon, after the decision of GPC referral had already been made, the Associate Dean Martins informed Vaibhav of the complaint and Vaibhav confirmed that he briefly connected with the patient on Instagram but quickly realized that may be considered unprofessional and blocked her and he

[3] SHELF exams, formerly known as Subject Examinations, are standardized exams administered by the National Board of Medical Examiners (NBME) and required as part of Medical School Education.

recounted the interaction for her, which was transcribed by Mari Cotera (Exhibit 9, pg. 3).

66. In accordance with what appears to be a disciplinary system based upon ideology that student is guilty until proven innocent and without conducting any investigation, Martins informed him that he was being referred to the Committee on Student Grading and Promotion (hereafter referred to as GPC) as a disciplinary measure, and she suspended him from clinical rotations until his meeting with GPC 18 days away, warned Vaibhav that the complaint could lead to serious negative outcomes ranging from failing the OB/GYN clinic to dismissal from the program and being placed on his residency letter, and Martins ignored his request to expedite the hearing date or address his concerns about having the allegation on the residency letter.

67. Notes from the meeting captured indicate that although Vaibhav told Martins that after sending the "follow" request, he did not contact the patient in question via text, IM or any other means, Martins told him "at least eight times that he is NOT to have patient contact of any kind in any clinic or hospital – required or of other kind", "that he is on a temporary LOA[4] (leave of absence) with NO patient contact". He was also forbidden from making any contact with any member of the GPC (Exhibit 9, pg. 3).

68. At the conclusion of the meeting Dr. Martins offered to shake his hand, but Vaibhav declined to shake hands with the Dean stating his hands were too sweaty at that point due to stress, a clear medical symptom.

[4] LOA – Leave of Absence is a disciplinary measure identified in the Grading Promotion and Academic Standing policy of Paul L Foster School of Medicine.

69. Vaibhav was informed that he would be receiving a follow-up e-mail leaving him with a heightened state of anxiety for the rest of the day.

70. The dreaded e-mail finally arrived, not an hour or two after the meeting, but about seven hours after the meeting, almost at midnight at 11:36 pm, which re-captured and amplified the threats of the meeting, with bold arrows pointed at the sections of the policy that "GPC recommendations may include individual remediation, delayed progression to Year 4, repeat of Year 3, delay of graduation or dismissal", "GPC may recommend a formal notation in the professionalism section on the MSPE[5]"

71. The email also included a copy of the "Grading, Promotion and Academic Standing (GPAS) policy, a 14-page document, twelve of which are dedicated to various punitive, corrective or remedial actions directed at students at the Paul L Foster School of Medicine (PLFSOM), the school where Vaibhav was enrolled.

72. In addition, to re-iterating the themes of the meeting, the email and the accompanying summary of the meeting from Martins laid out an action plan that started with an assumption of guilt.

73. Already assumed guilty, and already punished, Vaibhav was advised with recommendation for going in front of the committee to:

---

[5] The MSPE (Medical Student Performance Evaluation), often called the "Dean's Letter," is a comprehensive, standardized summary of a medical student's performance, experiences, and attributes, crucial for residency applications, providing objective information beyond grades and test scores to help program directors assess applicants. It's prepared by the medical school and includes academic history, clinical rotation summaries, noteworthy characteristics, professionalism details, and any academic difficulties, offering a complete picture for residency selection committee.

a. Give his explanation regarding the complaint - and be "honest and accountable"

b. Give his plan for ensuring that this never occurs again

c. Persuade the GPC that he is sorry this happened and it will never happen again

d. Humbly request the GPC to allow him to start his clinical work again and make up any time while *waiting for the investigation*.

74. All the instructions offered to him screamed that he was guilty and the only course of action open to him was to beg for forgiveness, but not to expect it, not a single instruction offered even the remote possibility that he was not guilty and not at any fault, all the while, he was suspended from participating in the very things he was there for, clinical training. Not only was there no instruction which gave him the option to state his innocence, there was no option for anyone to advocate for him, not even the ability to retain an attorney for representation is listed in the options or instructions provided when going before the GPC tribunal.

75. Tormented through the night and next morning by this explosive devastating e-mail highlighting the most dreadful possibilities shattering the dreams of a young aspiring professional, Vaibhav developed the irresistible impulse to end his life, in his mentally and physically exhausted state.

76. Browsing history from his device shows that he spent the remaining conscious hours researching various ways of ending his life, searching for tallest building in El Paso and then gun stores.

77. Unable to control his impulse, he wrote notes to describing his plan to end his life and went to the gun store and waited for it to open, and the store video and receipt show him purchasing a gun at approximately 10:27am on July 29, 2025.

78. Same day, on July 29, 2025, Vaibhav died by suicide, leaving a note (his known whereabout place the timing of the notes between 11:45 and 12:00 pm) which made it clear that his actions were a result of the school's actions against him, stating he believed he would be dismissed and he could not live with the shame put on him by the school and could not see a life worth living.


But I have failed you, I have
failed in being a good son.
I am facing dismissal from school
due to a lapse of professionalism,
& simply can not bear the shame,

Exhibit 10, Vaibhav's last note to his parents

79. In a symbolic gesture, to re-iterate his life-long desire to be a physician, he wore his doctor's white coat (something he was not wearing when purchasing the gun) and ended his life at the gun range close to the campus, in New Mexico somewhere between 1-3 pm in the afternoon.

80. He was found by his friends, demised, around 3:30 pm, who set out as a search party when Vaibhav's absence from the clinic around 1:30 pm triggered a request from his girlfriend to his roommate to check on him, who found his suicide notes, resulting in a frantic search by his friends in the area indicated in the notes. They reported the

location of his body in the New Mexico range to authorities that retrieved him and pronounced him dead at 5:46pm MST

81. Roughly 24 hours after the fateful meeting with Associate-Dean Charmaine Martins, Vaibhav was dead.

82. A single, unsubstantiated grievance filed by a blocked Instagram user was processed by the Defendant's unforgiving and unjust machine into a force that unjustly and wrongfully took his young promising life in less than 24 hours.

83. In general, medical school is a taxing and intense endeavor, and medical students in general report a considerable amount of stress and pressure in part due to ever-growing amount of information they are required to learn and retain as well as exceptionally high and exacting standards of performance they are expected to attain.

84. This unrelenting pressure cooker environment has been subject of much social and legal debate[6], and the number one cause of death among Male Medical Students is suicide (see Exhibit 11, Journal of American Medical Association Research Article, and the excerpt in para 120 below), all medical schools are responsible for this public knowledge.

85. On top of it, the school knew or should have known that this outcome was a very real risk for Vaibhav. The school had this information (see statement of Sherry Oldfield,

---

[6] Toy S. Medical residents face grueling work conditions—and many are at breaking point. Wall Street Journal [Internet]. 2024 Mar 5 [cited 2025 May 3]. Available from: https://www.wsj.com/health/medical-residents-working-conditions-young-doctor-suicide-3dc61495
Mossburg P. A broken silence: whistleblowing in medical education. Mitchell Hamline Law Rev [Internet]. 2004;30(1):315–35 [cited 2025 May 3]. Available from: https://open.mitchellhamline.edu/wmlr/vol30/iss1/18/

LNU, Exhibit 3a, pg. 1, para 4) and turned a blind eye to it when egregiously mishandling the baseless complaint against Vaibhav.

86. The antagonistic stance taken by TTUHSC against Vaibhav and its failure to support him was not an isolated incident, but part of a willful pattern exhibited so frequently by the administration that the entire class of 2028 felt compelled to write an open letter to the administration stating that "*There is growing perception among students that the administration is not simply unsupportive, but at times actively antagonistic*" citing comments made by faculty "*wishing more students had failed past exams or calling the class a "bad batch""*. (Exhibit 12, Class of 2028 letter to admin)

**SURVIVAL ACTION**

87. Plaintiff VIVEK DUGGAL and Plaintiff NEERU DUGGAL, As Successors In Interest To Decedent Vaibhav Duggal are entitled to survival action against all Defendants.

**WAIVER OF IMMUNITY**

88. **Waiver of Sovereign and Governmental Immunity**. Defendants Texas Tech University Health Sciences Center El Paso ("TTUHSC") and the individual Defendants acting in their official capacities are not immune from suit for the claims asserted herein for the following independent and cumulative reasons:

89. **Texas Constitutional Claims, Self-Executing Waiver**. Article I, Section 19 (Due Course of Law) and Article I, Section 17 (Takings Clause) of the Texas Constitution are self-executing and authorize suit without legislative waiver when the State

deprives a person of protected property or liberty interests without due course of law under Article I, § 19 of the Texas Constitution or just compensation. *City of Dallas v. Stewart,* 361 S.W.3d 562, 568 (Tex. 2012).

90. Texas Supreme Court has held that even a 10-day suspension from a public school is not a de-minimis property deprivation. Vaibhav was suspended for 18 days, with a threat of permanent suspension. *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929-30 (Tex. 1995)

91. Plaintiffs also seek attorney's fees under applicable Texas law.

92. Vaibhav Duggal possessed constitutionally protected property and liberty under the Texas Constitution, interests in:

   a. Continued enrollment and participation in a public medical school;

   b. Completion of required clinical rotations;

   c. His professional reputation and future residency prospects.

   d. Finishing his certified proficiency in medicine to enable him to acquire a license to practice medicine with a future career as a practicing doctor.

93. Defendants deprived him of these interests arbitrarily and without substantive or procedural due course of law under Article I, § 19 of the Texas Constitution. Immunity therefore does not apply.

94. Further, there is Substantive due course of law under Article I, § 19 of the Texas Constitution Violation: The reason for suspension was arbitrary, capricious, or fundamentally unfair, violating liberty/property rights, and Plaintiff's suit is authorized under the Texas Constitution as well.

95. **Texas Tort Claims Act (TTCA)**. The Texas Tort Claims Act, Tex. Rev. Civ. Stat. Ann. art. 6252-19, § 3, provides that each unit of government in the state shall be liable for money damages for death or personal injuries so caused from some condition or some use of tangible property under circumstances where there would be private liability. Lowe v. Tex. Tech Univ., 540 S.W.2d 297, 298 (Tex. 1976)

96. Without waiving the foregoing grounds, TTUHSC's immunity is further waived under the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code § 101.021, based on:

   a. Use and condition of tangible property, including:

      i. Physical clinical examination rooms;

      ii. Assignment of an unsupervised medical student into a high-risk OB/GYN clinical setting;

      iii. Clinical facilities used in a manner that created unreasonable risk of harm.

   b. Premises defect, where TTUHSC failed to make safe or warn of a dangerous condition, specifically, an OB/GYN clinical environment in which students were placed alone with patients contrary to written supervision policies.

97. TTUHSC's liability arises from how clinic' s tangible property and premises were used, in addition to conditions created by institutional processes, policies and administrative decisions.

98. The conditions and lack of supervision at the OB/GYN clinic, property of TTHSC resulted in Vaibhav's death, thus Plaintiff's action is authorized under Texas Torts Claims Act.

99. **Contracts with the State, Waiver Applies.** The student–university relationship is contractual in nature. In addition, this suit is also authorized under prevalent Texas law on contracts with state. Texas Supreme Court has ruled that immunity is waived when state enters into contracts.

"However, when the State contracts, the State is liable on contracts made for its benefit as if it were a private person. *State v. Elliott*, 212 S.W. 695, 697-98 (Tex. Civ. App.--Galveston 1919, writ ref'd). Consequently, when [*406] the State contracts with private citizens it waives *immunity from liability" Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405-06 (Tex. 1997)

100. TTUHSC waived immunity by entering into binding contracts with Vaibhav Duggal through its Institutional Handbook, academic policies, and clinical supervision policies. Also, the students were generally covered by insurance contracts on the clinic, and benefitted as third-party to those contracts and were therefore party to those insurance contracts.

101. **Ultra Vires Acts: Immunity Does Not Apply.** Under Texas law, sovereign immunity does not bar suits against state officials acting ultra vires, i.e., without legal authority or in direct violation of governing law or mandatory policy. City of El Paso v. Heinrich, 284 S.W.3d 366, 372–73 (Tex. 2009).

102. Plaintiffs seek declaratory and prospective injunctive relief against individual Defendants in their official capacities for actions taken without legal authority, including but not limited to:

a. Imposing disciplinary sanctions without conducting the mandatory investigation required by TTUHSC policies;

b. Suspending a medical student from clinical rotations without notice, investigation, or hearing;

c. Referring Vaibhav Duggal for "egregious" misconduct without factual basis or compliance with governing procedures;

d. Acting in direct contravention of TTUHSC's Institutional Handbook, Ambulatory Clinic Policy EP 6.6, and Grading, Promotion, and Academic Standing policies.

103. Because these acts exceeded the authority granted to Defendants under Texas law and TTUHSC's own binding policies, immunity does not apply. *Id*.

104. **Plea-to-the-Jurisdiction Anticipation and Jurisdictional Facts:** Plaintiffs anticipate that Defendants may file a plea to the jurisdiction asserting sovereign or governmental immunity. Plaintiffs affirmatively plead that this Court has subject-matter jurisdiction over this action because Plaintiffs assert claims for which immunity is not applicable, has been waived, or is otherwise inapplicable as a matter of law, including: (a) claims for declaratory and prospective injunctive relief against state officials acting ultra vires; (b) claims arising under self-executing provisions of the Texas Constitution, including Article I, §§ 17 and 19; (c) claims for declaratory and prospective relief against state officials acting ultra vires under Texas law; and d) claims for which immunity has been waived by contract and, alternatively and to the extent applicable, under the Texas Tort Claims Act.

105. Plaintiffs further plead that all jurisdictional facts necessary to establish the Court's jurisdiction are pleaded herein and, to the extent any jurisdictional facts are disputed, such facts are inextricably intertwined with the merits of Plaintiffs' claims and cannot be resolved without discovery. Accordingly, dismissal at the pleading stage would be improper, and Plaintiffs are entitled to jurisdictional discovery before any resolution of disputed jurisdictional facts. See Texas Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226–28 (Tex. 2004).

**COUNT I**

**PROCEDURAL AND SUBSTANTIVE DUE COURSE OF LAW UNDER ARTICLE I, § 19 OF THE TEXAS CONSTITUTION VIOLATIONS**

106. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth

107. Procedural due course of law under Article I, § 19 of the Texas Constitution requires that before depriving an individual of life, liberty, or property, the government must provide notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

108. The procedures must align with fundamental fairness ensuring that decisions are not arbitrary or capricious.

109. Vaibhav's suspension was a meaningful taking of his property interest. US Supreme Court has ruled that a even a 10-day suspension from a public school is not a de-minimis property deprivation. Vaibhav was suspended for 18 days, with a threat of

permanent suspension. *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 930 (Tex. 1995),

> "In defining the scope of protected liberty interests under the Fourteenth Amendment, the United States Supreme Court has stated that a liberty interest:
>
> Denotes not merely freedom from bodily restraint but also [**7] the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful [*930] knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of one's own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.
>
> *Roth*, 408 U.S. at 572 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 67 L. Ed. 1042, 43 S. Ct. 625 (1923). Moreover, where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of due process must be satisfied. *Goss v. Lopez*, 419 U.S. 565, 574, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1974); *Roth*, 408 U.S. at 573. Thus, where high school students were suspended from school for 10 days based on charges of misconduct, the school's unilateral suspension was found to deprive the students of a liberty interest in their standing with fellow students and their teachers and for later opportunities for higher education and employment. *Id*. at 575."
>
> *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929-30 (Tex. 1995)

110. Texas Constitution also prohibits taking of property, whether real or intangible, by state, and is self executing. *See* Article I, Section 17 of the Texas Constitution. Texas Supreme Court has ruled that "Takings Clause is self-executing—that it alone authorizes suit, regardless of whether the Legislature has statutorily provided for." *City of Dall. v. Stewart*, 361 S.W.3d 562, 568 (Tex. 2012). The Apex Court also ruled that:

> "The due course of law guarantee of the Texas Constitution provides:

> No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or [**5] in any manner disfranchised, except by the due course of the law of the land.
>
> TEX. CONST. art. I, § 19. The Texas due course clause is nearly identical to the federal due process clause, which provides:
>
> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; . . .
>
> U.S. CONST. amend. XIV, § 1. While the Texas Constitution is textually different in that it refers to "due course" rather than "due process," we regard these terms as without meaningful distinction. *Mellinger v. City of Houston*, 68 Tex. 37, 3 S.W. 249, 252-53 (Tex. 1887). As a result, in matters of procedural due process, we have traditionally followed contemporary federal due process interpretations of procedural due process issues.
>
> *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995)

Thus under Texas Supreme Court authority, TTUHSC can be sued under the self executing provisions of Texas Constitution, and Vaibhav's due course of law under Article I, § 19 of the Texas Constitution rights were violated as described below.

111. Defendants deprived Vaibhav of any meaningful due course of law under Article I, § 19 of the Texas Constitution before penalizing him by suspending him from all clinical rotation, the only meaningful activity that was available to him as a third year student, depriving him of his opportunity to complete his training in time, jeopardizing his set schedule, pre-defined by the university.

112. The grievance filed by the patient in OB/GYN clinic on Wednesday, July 23, 2025 (described above) triggered a process requiring the Clinic director to respond by July 30th (Exhibit 7, pg. 4). On July 28, 2025, five days after the grievance was filed by the

patient against the clinic, Vaibhav was called into a meeting with Associate Dean Dr. Charmaine Martins at around 2:45 pm (Exhibit 8, pg. 11).

113. It is noteworthy that no meaningful investigation of any kind was carried out by the defendants to validate or investigate the contents of the grievance. The entire effort by the defendants appears to have been focused on protecting themselves at the expense of the young student in their charge. The people most closely involved with the clinic and its operation on the day of the alleged concern, the manager of the clinic and the director of the clinic were left out of the loop (Exhibit 3a, Email from Sherry Odfield, Exhibit 4, E-Mail from Katelyn Welshans on 7/25/25 at 6:35pm, two days after the incident, professing she knows very little and seeking guidance from Martins and Francis).

114. The only person that possibly had any direct knowledge, the Nurse Practitioner that conducted the exam was instructed to not communicate with anyone, including her immediate direct supervisor, ensuring no one had access to any facts and nor could anyone inform, reach out to or watch out for the student being targeted (Exhibit 3a, Sherry Oldfield Email Attachment, Page 1).

115. There is no record that any person, supervisor, manager or practitioner in the clinic observed or noted any action on part of Vaibhav that was of any concern on the day of the visit in question.

116. In fact, the only feedback available about Vaibhav from the OB/GYN clinic that day is evaluation from the clinic of his performance, which was marked “excels in

professionalism" (Exhibit 6) , which also appeared to be his evaluation in all his clinics thus far (Exhibit 9, pg. 3)

117. The grievance of "feeling uncomfortable" in an initial intake in a clinic, was given implied color and commentary by the Defendants, managers and directors on their own volition, that took charge of it, without any context of the events or first hand knowledge of the events which added color and bias like "this is a very serious accusation" (by the Director of Quality Improvement, Talia Raya, Exhibit 8, pg. 2), "we are awaiting guidance from Title IX folks" (from Vice Chair of the Clinic, Eugene Toy, Exhibit 8, pg. 1), "I am copying risk management" (from Director of Quality Improvement, Talia Raya, Exhibit 8, pg. 2), while at the same time professing a complete lack of consistency in even basic facts "In the medical record we have no mention of the student being in the examination. Dr. Toy can you please ask NP Alejandra Cabral if there was a student present in the examination" (same email from Talia Raya, Exhibit 8, pg. 2))

118. The Director of Quality Improvement, Talia Raya, was willing to engage risk management and designate the filed grievance as a serious accusation even when she was unsure if the student was even present in the examination (exhibit 8, pg. 2).

119. Two days later after the grievance was filed, at 6:35pm on Friday, the 25th of July, 2025 the Director of Clerkship and the OB/GYN Clinic wrote an email to two Associate Deans, Dr. Maureen Francis and Dr. Charmaine Martins, admitting that she was just finding about this "student issue" in the clinic stemming from a "patient concern". She indicated that "this has been escalated far above her" head already, and only

found out about it the same day (Friday), seeking guidance on what she needed to do or what documentation she needed to do (Exhibit 4). She did not raise a concern or communicate an issue, she was simply catching up and trying to understand if she needed to do anything to "paper" an assumed issue already escalated above her head.

120. She was informed by Dr. Maureen Francis, Associate Dean of Medical Education, that Dr. Martins had been working on this, and that she will need a formal referral to the GPC for an "egregious" breach of professionalism (Exhibit 4, pg. 1), and they are talking about removing the student from patient care while awaiting the GPC. The internal, uninformed and one sided exchanges by defendants had not only already transformed the "concern" into an "egregious breach of professionalism", they had already settled on the punishment as well, all without even hearing what Vaibhav had to say, or even confirming who did the exam or who else was in the room and if they saw or heard anything to corroborate the grievance.

121. This "patient concern" now transformed into an "egregious breach of professionalism" was thus duly reported by Dr. Welshans as agreed on Friday, July 25, 2025 after 6:30 pm (Exhibit 4, pg. 1) and directed by Dr. Martins, back to Dr. Martins on Monday morning at 10:26 am (Exhibit 9, pg. 1), so that Dr. Martins could claim she had just received a complaint against Vaibhav on Monday, both to Vaibhav, and subsequently to his parents when tried to find out what happened, without ever disclosing that this was a pre-ordained outcome, directed by herself through Dr. Welshans, who was willing to comply with the direction, and write the e-mail on Monday as if it originated from her.

122. Dr. Welshans, without any prior knowledge of the incident, without any knowledge of the actual facts, and without any investigation or even basic inquiry that the stated allegations had any substance[7], went on to refer Vaibhav for an "egregious violation" of "professionalism" in the same clinic that had evaluated him as "excels in professionalism" the same day, simply because she was directed to do so, and was willing to do so, all the while acknowledging that she had not had any opportunity to "speak with the student" "due to clinical obligations", "but did not want to delay the GPC referral process"

123. Clinical Director Welshans acknowledged she was "too busy" to investigate or even talk to the student being accused and disciplined, and presuming guilt and suspending Vaibhav was easier than investigating facts in face of a five day deadline, even if that meant completely bypassing the "Investigation Process" required by TTUHSC's own policy (Exhibit 1, pg. 2) .

124. The process identified in EP Policy 6.6 (Exhibit 1) Titled "Feedback, Complaint and Grievance Procedures" identifies the steps required for Investigation Process as follows:

**3. Investigation Process:**

a. Initial acknowledgment. The complainant will be notified that the grievance has been received, that it will be investigated, and that they will receive notification once the issue has been resolved.

---

[7]The only allegation was that Patient felt uncomfortable with questions asked during the intake for a STD Screen/Pap-Smear by a male medical student and messages received, hours after she left the clinic and several hours after she was blocked on Instagram and provided no actual messages of any kind other than a request to follow, which herself had invited.

b. Interview the complainant. It is critical to understand desired outcome at the outset of the investigation.

c. Gathering of facts. An interview process should commence to determine the scope of the problem. Parties involved in the situation will be interviewed in order to uncover the root of the problem.

d. Review relevant medical records

e. Interview staff with potential knowledge of the situation

f. Research applicable laws, regulations, policies, and procedures

g. Identify measures, including those already taken, to resolve the problem

125. These investigative steps identified in the policy were completely bypassed. Defendants made no attempt to investigate or address why the student was allegedly alone with a female patient in a OB/GYN clinic – where he had no protection, no liability insurance, was not adequately trained to handle unusual interactions, and gave conflicting accounts after the death on what actually happened, who actually did the exam or what the interactions were, and changed their stories on whether Vaibhav was suspended or simply informed he "might" be suspended. The policy required a response from the clinic withing five (5) days, and a response back to the person making the complaint in seven (7) days (Exhibit 1, pg. 2, Step 4 (a)). Defendants simply failed to even initiate the steps needed to comply with this policy.

126. Defendants also failed to investigate that if the student was not alone with the patient, why was interaction not supervised or stopped if it was deemed in appropriate, and if it was not deemed appropriate, why the grievance not simply dismissed?

127. Defendants failed to and then refused to perform even the basic fact finding of an investigation. There was no record of the Attending Physician, or Nurse Practitioner or other Clinical Staff's observations on the visit in question.

128. A decision to suspend and refer to GPC was made BEFORE a meeting with Vaibhav was set, he was simply offered no due course of law under Article I, § 19 of the Texas Constitution, and even the referral request was a sham, created on instruction of the very person that intended to receive it.

129. Notes from the meeting captured by Mari Cotera (Exhibit 9, pg. 3) show that although Vaibhav told Associate Dean Martins that after the Instagram follow request, he did not contact the patient in question via text, IM or any other means, Dean told him "at least eight times that he is NOT to have patient contact of any kind in any clinic or hospital – required or of other kind", "that he is on a temporary LOA[8] (leave of absence) with NO patient contact". He was also forbidden from making any contact with any member of the GPC.

130. Defendants acted wrongfully when they failed to follow protocol and investigate the complaint made by the patient before punishing him by not allowing him to continue clinicals was systematic failure. TTUHSC's Student Handbook (Exhibit 2, PART II, F (1-4)) defines the process for addressing complaints against students, including students enrolled in PFSOM. None of the steps outlined in the handbook appear to

[8] LOA – Leave of Absence is a disciplinary measure identified in the Grading Promotion and Academic Standing policy of Paul L Foster School of Medicine.

have been followed to make a finding of any professional misconduct on part of Vaibhav.

131. The Institutional Handbook defines the process for reporting, investigating and adjudicating allegations of misconduct, including allegations of any sexual misconduct which was implied by engaging "Title IX folks (see Exhibit 8, Email from Eugene Toy, pg. 1). The processes are invoked with a set of forms (Exhibit 13, Attachment A and B forms) that are included in the handbook, that require not only the written description of facts of the complaint, but also a *certifications that the information provided is accurate and complete,* signed by the person making the complaint, a copy of which is to be provided to the student accused, followed by a notice period, a preliminary informal hearing with an opportunity to dismiss the complaint informally, followed by a formal hearing with witnesses and evidence as defined in Part II, Section F of the Handbook (Exhibit 2). None of that happened. Not one step.

132. No form was ever filled out or certified by Welshans OR the patient. No certification of facts allegedly occurred, no copy was provided to Vaibhav. He was simply deemed guilty, warned with dire consequences with no hope, and the only guidance he was given was to make a plan to ask for forgiveness for an "egregious violation" of professionalism, something he was struggling to understand, as a "Instagram follow request" is hardly an egregious violation of professionalism. Most young professionals have Instagram accounts as do many licensed doctors practicing medicine. According to defendants logic used against Vaibhav, any practicing doctor

that happened to see an acquaintance in a clinic that may have been already connected on Instagram would be in similar egregious violation of professionalism and would be at the risk of losing their license based just on a bare patient complaint devoid of any evidence, without any investigation or hearing.

133. Defendants utterly and completely failed to provide any due process to Vaibhav before starting his punishment. The only next step left was how much more he was going to be punished. There never was an evaluation of whether or not he should be punished.

   a. Plaintiffs also allege that individual defendants, Welshans, Martins, Toy, Francis, Raya and Belletete violated Vaibhav's procedural and substantive due process rights under Texas Constitution: Defendants deprived Vaibhav Duggal of constitutionally protected property and liberty interests without due process of law, including:

      i. Suspension from mandatory clinical rotations;

      ii. Exposure to dismissal and adverse residency reporting;

      iii. Damage to reputation and professional standing.

134. Procedural due process was violated because Defendants Imposed discipline without investigation; Provided no notice of specific charges; Provided no meaningful opportunity to be heard; Pre-decided punishment before any hearing.

135. Substantive due process was violated because Defendants' actions were arbitrary, capricious, conscience-shocking, and bore no rational relationship to legitimate academic or safety objectives.

136. Defendants were deliberately indifferent to the known and foreseeable risk of severe psychological harm, including suicide, resulting from their actions.

137. Defendant Lange violated Plaintiff's due process rights by ratifying the actions of Welshans, Martins, Toy, Francis, Raya and Belletete.

138. Plaintiffs seek damages, declaratory relief, and attorney's fees under applicable Texas law.

139. Defendants failed to provide Vaibhav with the procedural and substantive due course of law under Article I, § 19 of the Texas Constitution.

**COUNT II**

**WRONGFUL DEATH**

140. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if set forth herein for sake of brevity.

141. Under Texas law, wrongful death statute provides that "a person is liable for damages arising from an injury that causes an individual's death if the injury that causes an individual's death if the injury was caused by the person's or his agent's or servant's wrongful act, neglect, carelessness, unskillfulness, or default." Tex. Civ. Prac. & Rem. Code §71.002(b). "The … parents of the deceased may bring the [wrongful-death] action …" Id. § 71.004(b). "But parents may bring a wrongful-death action 'only if the individual injured would have been entitled to bring an action for the injury if the individual had lived.'" Id. § 71.003(b)." "The ability of parents to maintain a wrongful-death action 'is entirely derivative of the decedent's right to

have sued for his own injuries immediately prior to his death."' In re Labatt Food Serv., L.P./ 279 S.W.3d 640, 644 (Tex. 2009).

142. Generally, there is no duty to prevent another adult suicide, but duty can arise when there is a special relationship, and the institution has custody, control or supervisory authority, and the risk of harm is foreseeable. *Torrington Co. v. Stutzman,* 46 S.W3d 829, 837 (Tex. 2000)

**DEFENDANTS HAD A SPECIAL RELATIONSHIP WITH PLAINTIFF**

143. Texas law generally does not have a special relationship between a university and its students that is sufficient to create a duty of care to hold the university liable for negligence.

144. "Under Texas law, the legal relationship between a medical student on a clinical rotation and the clinic where they are performing the rotation is primarily governed by the agreements and arrangements between the medical or dental school and the clinic. According to Tex. Health & Safety Code § 312.004, medical and dental schools, along with public hospitals and other entities, may enter into contracts to coordinate or cooperate in the clinical education of students. These contracts allow the parties to determine the terms and conditions of the clinical education, including the roles and responsibilities of the students and the clinic. Tex. Health & Safety Code § 312.004."

145. Vaibhav and TTUHSC/clinic had a relationship that went beyond that of a student and university because he was performing clinical work on actual patients outside of the classroom.

146. Courts have begun to accept the special relationship that exists between a university and its students. The Massachusetts Supreme Court in a similar case involving student suicide has stated "We begin with the Restatement (Third) of Torts, which states that "[a]n actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 40(a) (2012). Included in the list of special relationships giving rise to such duty is "a school with its students." Id. at § 40(b)(5). This, of course, is the beginning and not the end of the analysis. There is a wide range of schools -- from elementary to graduate school -- and great differences in the scopes of student-school relationships. Additionally, the Restatement (Third) of Tort's formulation of special relationship is not focused on the specific question of student suicide" Nguyen v. Massachusetts Institute of Technology (SJC 12329) (May 7, 2018) (expands special relationship to University/Student relationship)

147. In addition to the Restatement Third of Torts, Texas law imposes a duty when special relationships or special circumstances exist. Courts have found an employer liable for the wrongful death of an employee who committed suicide considering it a special relationship. To find a duty Court looked at several factors including the "risk, foreseeability, and likelihood of injury weighted against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of place the burden on the defendant." Shell Oil Co. v. Humphry, 880 S.W.2d 170, 174 (14th Ct. App. June 16, 1004) (citing Greater Houston Transp. Co. v.

Phillips, 801 S.W.2d 523, 525 (Tex. 1990)). Foreseeability is the dominant consideration. Id.

148. In clinical rotations, medical students are acting as employees of the clinic and perform the same functions as other paid employees of the clinic and expected to abide by employee policies, have employee access to facilities and resources, carry the same functions as other employees unsupervised, at various times.

149. In fact, there is evidence and available testimony that students and residents are frequently used to displace paid labor of other professionals as a cost saving measure.

150. Similarly situated residents (also in training, much like the student clerks) are statutorily defined as employees of the clinic. *See Tex. Civ. Prac. & Rem. Code Section 101.004.* Medical students and residents are part of the same group in clinics, supervised by the same attending as neither is licensed to practice medicine under the Texas Occupations Code.

151. The similarity in the nature of their work, insufficiency of their training for independent practice and lack of license requiring similar supervision warrants the "special circumstances" to create the special duty imposing a duty of care. See *Torrington Co. v. Stutzman,* 46 S.W3d 829, 837 (Tex. 2000) (Texas law generally imposes no duty to take action to prevent harm to another, absent certain special relationships or circumstances.)

152. In the course of providing educational services to Vaibhav, including any disciplinary process at GPC or other forums for which TTUHSC administrators are solely

responsible, Defendants collectively had a special relationship duty with Vaibhav as one of their students to protect him against the unreasonable risk of harm, including self-harm.

153. TTUHSC had a Special relationship with Vaibhav as the clinical rotations were not optional. He was required to participate in these clinical rotations to graduate, and the location, condition, manner, method and protocols were all in control of TTUHSC, and Vaibhav had no choice in the matter.

154. There was a special relationship because the school provided pre-defined structured assignments, expectations, and control over the student as the institution has supervisory authority, control and power over its students including Vaibhav. The school assigned, supervised, evaluated and unjustly disciplined him because of actions during this school assignment. The Attending doctor and Clinical Management were supervising and evaluating him and TTUHSC controlled placement, workload, grading, reporting and remediation procedures.

155. Texas Supreme Court in *Exxon Corp. v. Brecheen*, held that "there may be liability [for suicide] if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide. *Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 524 (1975).

156. Suicide does not automatically sever causation when the defendant's negligence created or intensified a mental health crisis, the defendant had notice of the risk, and the defendant had the ability to intervene reasonably. *Id*

157. *In Exxon Corp v. Brecheen, 526 S.W.2d 519*, the Texas Supreme Court acknowledged that liability may exist if the defendant's negligence caused a mental illness that resulted in an uncontrollable impulse to commit suicide. The court emphasized that suicide under such circumstances could be considered a direct result of the defendant's wrongful act, rather than an independent intervening cause, particularly when the mental illness impaired the individual's ability to control their actions.

**DEFENDANTS HAD A DUTY TO VAIBHAV**

158. At all times relevant, Vaibhav was a student at TTUHSC Paul Foster School of Medicine.

159. At all times mentioned herein, Defendants owed a duty of care to its students, including Vaibhav.

160. Defendants had a duty to ensure a safe environment on campus for both living and learning for its students, including Vaibhav.

161. Defendants had a duty to know that a typical medical student present traits of perfectionism- which is associated with additional pressures. In fact, the school's policies and Institutional handbook, clinical policies all demand and expect the highest level of professionalism and perfectionism, holding medical students accountable to highest possible standards. (See Exhibit 2, Institutional Handbook, Sections E1-3, Exhibit 14, Clinical Supervision of Medical Students, Section 6)

162. Defendants had a duty to know what a clinical suspension or adverse comment in residency applications, or dismissal from school and other penalties in the third

year of medical student would be to his academic and professional career and his future.

163. Defendants owed its students, including Vaibav, a duty of reasonable care in the hiring, training, and supervision of its staff, administrators, medical care professionals, therapists, and/or counselors and creating and operating a safe environment for learning and training in clinical activities.

164. Defendants had a duty to know what a clinical suspension or adverse comment in residency applications, or dismissal from school and other penalties in the third year of medical student would do to his academic and professional career and his future.

165. Defendants owed its students, including Vaibav, a duty of reasonable care in the hiring, training, and supervision of its staff, administrators, medical care professionals, therapists, and/or counselors and creating and operating a safe environment for learning and training in clinical activities.

**DEFENDANTS WERE AWARE OF RISK, FORSEABILITY AND LIKELIHOOD OF INJURY TO VAIBHAV**

166. Defendant's negligence created and failed to address a foreseeable mental health crisis that resulted in death.

167. There is considerable research on sources, causes and consequences of these mental health issues, and specifically suicide that is readily available. American Medical Association's prestigious Journal of American Medical Association (JAMA) has published research that suicide is the number one cause of death in young male

medical residents. Source: Yaghmour NA, Bynum WE, Hafferty FW, et al. Causes of Death Among US Medical Residents. *JAMA Netw Open*. 2025;8(5):e259238. doi:10.1001/jamanetworkopen.2025.9238.

Table 1. Causes of Death of Residents and Fellows From 2000 to 2014 and 2015 to 2021[a]

| | Female | | | Male | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| Cause of death | 2000-2014, No. (rate) | 2015-2021, No. (rate) | IRR (95% CI) | 2000-2014, No. (rate) | 2015-2021, No. (rate) | IRR (95% CI) | 2000-2014, No. (rate) | 2015-2021, No. (rate) | IRR (95% CI) |
| Suicide | 16 (2.27) | 12 (2.73) | 1.20 (0.56-2.53) | 50 (5.44) | 35 (6.70) | 1.23 (0.79-1.89) | 66 (4.07) | 47 (4.89) | 1.20 (0.82-1.74) |
| Neoplastic diseases | 38 (5.4) | 14 (3.18) | 0.59 (0.31-1.06) | 42 (4.57) | 14 (2.68) | 0.59 (0.31-1.05) | 80 (4.93) | 28 (2.91) | 0.59 (0.38-0.90)[b] |
| Other medical and surgical diseases | 17 (2.41) | 7 (1.59) | 0.66 (0.26-1.53) | 34 (3.7) | 15 (2.88) | 0.75 (0.40-1.35) | 51 (3.14) | 22 (2.29) | 0.73 (0.43-1.18) |
| Accidental poisoning | 3 (0.43) | 2 (0.45) | 1.07 (0.14-6.45) | 19 (2.07) | 19 (3.64) | 1.76 (0.93-3.34) | 22 (1.36) | 21 (2.18) | 1.61 (0.88-2.94) |
| Accidents | 18 (2.56) | 6 (1.37) | 0.53 (0.19-1.27) | 38 (4.14) | 16 (3.06) | 0.74 (0.40-1.30) | 56 (3.45) | 22 (2.29) | 0.66 (0.40-1.07) |
| Ill-defined or of undetermined intent[c] | 6 (0.85) | 4 (0.91) | 1.07 (0.27-3.74) | 22 (2.39) | 6 (1.15) | 0.48 (0.18-1.11) | 28 (1.73) | 10 (1.04) | 0.60 (0.28-1.20) |
| Undetermined intent, poisoning | 1 (0.14) | 3 (0.68) | NR | 5 (0.98) | 2 (0.38) | NR | 6 (0.37) | 5 (0.52) | 1.41 (0.41-4.67) |
| Infectious disease | 3 (0.43) | 1 (0.23) | NR | 5 (0.54) | 3 (0.57) | 1.06 (0.22-4.30) | 8 (0.49) | 4 (0.42) | 0.84 (0.23-2.68) |
| Homicide | 3 (0.43) | 1 (0.23) | NR | 4 (0.44) | 1 (0.19) | NR | 7 (0.43) | 2 (0.21) | 0.48 (0.07-1.99) |
| Totals | 105 (14.77) | 50 (11.36) | 0.76 (0.54-1.06) | 219 (23.95) | 111 (21.28) | 0.89 (0.71-1.12) | 324 (19.96) | 161 (16.74) | 0.84 (0.69-1.01) |

168. Center for Disease Control (CDC) a federal government agency, data and research show that across the nation for ages 1-44, suicide was number two cause of death in 2023, higher than every known disease, as roughly 24,000 Americans committed suicide in 2023. This information that is regularly provided to and reviewed by medical community




Source: CDC (https://wisqars.cdc.gov/animated-leading-causes/)

169. Suicide as a high probability foreseeable risk is not a recent or new phenomenon, it has been in top four leading causes of death for over 40 years. (Suicide was fourth leading cause in 1981 and rose to second position starting 2013 and has remained number two cause for over a decade)

170. The legal analysis prevalent in case law is rooted in data and notions from almost three centuries ago has yet to account for the foreseeability and probability of suicide which now stands at a rate 50% higher than homicide for first half-life of Americans across the nation.

171. If one considers the number of resources dedicated by society to prevent homicide and the burden carried by society to prevent homicide in general, the amount of resource dedicated to preventing suicide is practically non-existent by comparison.

172. Defendant's published resources for mental health including suicide are limited to "915- TALK" hotline that generally goes unanswered and the suicide line is staffed by volunteers like Vaibhav, who frequently volunteered at a suicide hotline himself.

173. Ironically, Texas Tech University that TTUHSC is a part of, cites in its own web sites that 1 in 3 TTU students tested positive for a significant risk of suicidal behavior during a suicidal screening that was published in 2022 (TTU RISE, ACHA Report, 2022)

> **The Importance of Being Aware**
>
> 1 in 3 TTU students tested positive for a significant risk of suicidal behavior during a suicidal screening (TTU RISE, *ACHA Report*, 2022).

Source: https://www.depts.ttu.edu/rise/suicideprevention.php

174. Defendants thus were aware of the risk, foreseeability, and likelihood of injury to medical students and residents as published in their own research on mental health issues faced by this population and the research available to them.

175. Kentucky Supreme Court in *Patton v. Bickford*, 529 S.W.3d 717 (Ky. 2016), in analyzing foreseeability of suicide of a student relied on the fact that Kentucky Board of Education's own website contained a letter to teachers indicating bullying as a source of suicide had escalated, and charged the school with that knowledge. Defendants here, were in possession of similar and far more specific knowledge about foreseeability of suicide in their student population and more specifically, male medical student population.

176. Defendants collectively, as the institution and the individuals are charged with this knowledge and given the high prevalence of suicide risk at TTU student body, likelihood of Vaibhav's suicide was entirely foreseeable and predictable.

177. Further, Defendants Martins, Toy, Welshans, Reddy, Francis, Lange are all licensed and practicing physicians and are independently and specifically charged with this knowledge.

178. Additionally, Dr. Martin, a licensed medical doctor, was or should have been aware of the risk specific to Vaibhav when she suggested he visit counseling on second floor, acknowledging her awareness that Vaibhav was at risk of psychological issues that needed attending. She also knew or should have known the immediate risk of injury including risk of self-harm to Vaibhav when he informed her that he had sweaty palms, an indication of the tremendous stress of the unconstitutional (Texas State Constitution) and unjust disciplinarian conduct of the school. Even after all this specific knowledge of risk to Vaibhav, the defendants sent late night glaringly harassing emails regarding their unconstitutional (Texas State Constitution) disciplinary actions against him. And, even though a defendants including TTUHSC had a duty of care in these circumstances, they intentionally turned a blind eye and completely and willfully disregarded their duty of care for Vaibhav when they refused to reach out to him and follow up with support, and refused to adhere to any professional standard of non-guilt assuming emails within the bounds of professional work hours.

179. Foreseeability of harm is also established for this special relationship as the TTUHSC had specific knowledge of high risk of suicide ( 1 in three students were found to be at high risk by TTU's own research), published medical research from JAMA (Exhibit 11) showing suicide as the NUMBER 1 cause of death among male medical students and residents, CDC's published data identifying suicide as second leading cause of death across the nation for ages 1-44 (Exhibit 15) .

180. TTUHSC knew or should have known that Vaibhav had pre-existing issues that created additional risk and/or responsibility for his safety and well-being when administering disciplinary measures, and certain clinical managers appear to admit that (see statement by Clinic Manager, Sherry Oldfield, Exhibit 3a).

181. Moreover, TTUHSC clinical management and staff had specific knowledge of Vaibhav's susceptibility to suicide or self harm under the circumstances (Exhibit 3a, pg. 1). Unfortunately, as explained above, people with any direct and specific knowledge of Vaibhav or the circumstances around the incident were explicitly excluded from any communication, and since no formal investigation ever took place, were left completely in the dark until it was too late.

**DEFENDANTS BREACHED THEIR DUTY TO VAIBHAV**

182. Defendants breached their duty by not creating or providing a safe environment for Vaibhav to learn and train, exposing him to risks from clinical patients when he was asked to perform tasks in a high risk setting unsupervised and without any witnesses or insurance protection.

183. The clinic was negligent in its supervision and/or supervision policies, which put Vaibhav in a vulnerable position, exposing him to the risk of such grievance getting filed by a patient.

184. Defendants breached their duty by not protecting Vaibhav from self-harm while exposing him to extreme and unjustified stress based upon a unsubstantiated grievance that only alleged "uncomfortable" patient with an intake that was facially inconsistent with its own recitation of facts that showed she was comfortable enough to offer her Instagram handle and did not get uncomfortable until she was blocked on Instagram

185. Defendants breached their duty by not following the process outlined in the Institutional Handbook (Exhibit 2) and its published policies (Exhibit 2, Institutional Handbook -Exhibit 1, Ambulatory Clinic Policy and Procedure EP 6.6 ) as well as additional published policies on Clinical Supervision of Medical Students and General Clerkship Supervision Policy.

**1. Supervision of Students in Clinical Settings**

- **Section: General Clerkship Supervision Policy** (Page 4–5)
  - Students must be **appropriately supervised** by faculty or residents at all times during patient care activities.
  - *Direct supervision* is required for procedures or sensitive exams that the student has not yet demonstrated competence in.
  - Supervisors must ensure **patient safety and comfort** and verify findings gathered by the student.

## 2. Patient Consent & Sensitive Examinations

- **Section: Sensitive Examinations** (Page 14)
  - A "sensitive examination" is defined as one involving breasts, genitalia, or rectum, **regardless of patient gender.**
  - **Explicit patient consent** must be obtained before the exam.
  - **Chaperone presence** is required for these exams.
  - The student must be introduced as a medical student and the supervising physician must be identified to the patient.

186. These published policies clearly defined that Vaibhav should never have been alone with a patient in OB/GYN clinic, and Defendant's breached their duty to protect Vaibhav by breaching these written policies. These policies are promulgated by "JOINT COMMISSION" which is the certifying authority for medical schools, including TTUHSC Paul Foster School of Medicine and school is required to follow them to maintain its certification.

187. Defendants also breached their duty by arriving at a conclusion to suspend him before even setting the first meeting with Vaibhav in violation of their published policies. (Exhibit 4, Email from Francis to Katelyn dated July 25th @ 8:27PM.)

**DEFENDANT'S BREACH CREATED THE INJURY AND DAMAGED PLAINTIFFS**

188. Notes left before death clearly articulate the reason for suicide and leave no ambiguity as to why Vaibhav took his life (Exhibit 10). Vaibhav explicitly stated that the message he received, both verbally and later in e-mail from Associate Dean Charmaine Martins and the highlighted threats of suspension from the program, and medical school itself were outcomes he simply could not live with and would rather end his life than live with those outcomes.



But I have failed you, I have
failed in being a good son.
I am facing dismissal from school
due to a lapse of professionalism,
& simply can not bear the shame,

Excerpt from Exhibit 10, Note left by Vaibhav

189. The Defendant's actions were wrongful and were the principal factors contributing to cause of death.

190. Defendants wrongfully and intentionally painted a bleak picture with no hope for Vaibhav, and then amplified and re-enforced that message in the email sent at 11:36 p.m. (Exhibit 9, pgs. 6-26).

191. Defendants offered no comfort or support but instead added to distress by forewarning to expect an e-mail and sent that e-mail near midnight when Vaibhav was silently dreading a potential bad outcome.

192. The late-night E-Mail (Exhibit 9) from Charmaine Martins to Vaibhav delivered at 11:36 p.m. on Monday, July 28, 2025 set the stage for assumed guilt, assigned fault, highlighted extreme disciplinary measures without any basis.

193. The message offered no hope for redressal or path forward without significant negative consequences resulting in "unbearable shame of failure" over an unsubstantiated claim of "DISCOMFORT" where facts of the claim itself undercut the severity of alleged discomfort. Nowhere in the communications within the administration or with Vaibhav was there any attempt to address the facial inconsistencies of the grievance such as:

a. If the patient Jane Doe was uncomfortable, why did she allow him to stay during the exam?

b. Why did she share her Instagram handle AFTER the exam?

c. Why did she invite Vaibhav to follow her on Instagram as she was leaving?

d. Why did she wait until she was blocked on Instagram to lodge a grievance?

e. If there was an inappropriate message during the one hour they were connected on Instagram, why did she not share or save that message[9]?

194. Defendants created the circumstance where Vaibhav was placed alone in a high risk setting without any supervision, no ability to protect themselves or defend themselves.

195. When alleged grievance [10] was submitted, there was not even an attempt to investigate or substantiate before drastic action to suspend Vaibhav from clinical rotations was taken.

196. Action taken appears to be driven solely to meet a deadline on the grievance response (See Exhibit 7, Letter to Clinical Director identifying grievance and response deadline of July 30th, 2025, pgs.1 and 4)

197. Welshans, the Clinical Director acknowledged she was "too busy" to investigate, and yet presuming guilt and suspending Vaibhav was easier than investigating facts in face of a five day deadline.

---

[9] Alleged grievance seems to imply that since she was blocked, she did not have any message to share. However, Instagram messages remain with the recipient even after they are blocked by a user. There are no messages located in Vaibhav's account and none were submitted by the patient.

[10] TTUHSC policies have specific definitions and processes for filing grievance, and this patient in expressing her "concern" appears not to have followed any of them

198. Defendants made no attempt to investigate or address why the student was alone with a female patient in a OB/GYN clinic – where he had no protection, was not adequately trained to handle unusual interactions, and gave conflicting accounts after the death on what actually happened, who actually did the exam or what the interactions were, and changed their stories on whether Vaibhav was suspended or simply informed he "might" be suspended.

199. The biased, accusatory and consciously indifferent mindset of defendants was evident in calls to Vaibhav's parents after his death, where Defendants intentionally and purposefully misstated that Vaibhav conducted the pelvic exam, implied misconduct on his part but admitted that no investigation had taken place, and insisted none could take place now that Vaibhav was dead, when the clinical documentation did not reflect that he was even present during the examination of the patient, and documentation reflected that a Nurse Practitioner conducted the examination, a fact supported by contents of grievance itself.

200. Defendants failed to and then refused to perform even the basic fact finding of an investigation. There was no record of the Attending Physician or Nurse Practitioner or Clinical Staff's observations

201. A decision to suspend and refer to GPC was made BEFORE a meeting with Vaibhav was set, he was simply offered no due course of law under Article I, § 19 of the Texas Constitution before being penalized, as explained below.

202. Defendants acted wrongfully when they failed to follow protocol and investigate the complaint made by the patient before punishing Vaibhav by not allowing him to continue his clinical rotations.

203. Defendants acted wrongfully be failing to continuously check on him and offer him support when he was distraught over the punishment meted out to him without any due course of law under Article I, § 19 of the Texas Constitution with threat of far more dire consequences to come.

204. Defendants most egregiously breached their duty when even after Dr. Martins noted the distress when recommending counselling, even after Vaibhav told him of his sweaty hands, she sent an alarming e-mail full of bad outcomes that awaited him, especially highlighted with bold arrows pointing to terrible outcomes Vaibhav faced, highlighted sections that presumed him guilty even before he had an opportunity to present his case to GPC, tasking him to "humbly beg for forgiveness" while persuading the committee on his action plant to ensure such conduct would never happen again at midnight. There was no particular business purpose or legitimate reason to send such a threatening and stressful email at midnight where the recipient would have no access to any resource, family, friends for support, where an impulse may go unchecked and may be magnified.

**The Defendants' breach was the direct/proximate cause of the damages.**

205. Defendants' failure and breach of their duty created a distress for Vaibhav so intense that he could see no way out of that pain other than to end his life. He documented that pain in his suicide note, clearly articulating that the meeting with Martins was

the reason he was taking his life, used the rest of the night to plan his suicide in his head, researched tallest building in El Paso and gun store hours.

206. The irresistible impulse kept getting magnified throughout the night and next morning where the only task he could imagine next morning was to wait outside the gun store for it to open (at 10:00 am), acquire a gun (at about 10:26 a.m.), write his write his suicide notes (between 11:45 and 12:30 pm), execute his plan to distribute what little assets he had, including an apology to his roommate, and an attempt to re-imburse his roommate for the rent he would no longer get (between 11:45-12:30) and then drive to a previously known spot to end his life (sometime after 12:30 pm).

207. Under Texas law, these circumstances warrant the exception to the general rule that suicide is the intervening cause of death, as Courts have ruled “But if a certain wrongful act, or acts, produces a rage or frenzy whereby the person committing suicide was so devastatingly injured by the defendant's wrongful acts and, thereafter, destroys himself or herself during such rage which resulted in an uncontrollable [**9] impulse, then the wrongful act or actions of the defendant may be considered in the correct case as within the line of causation from the defendant's wrongful acts and actions to the suicide” *Diggles v. Horwitz*, 765 S.W.2d 839, 842 (Tex. App.—Beaumont 1989, writ denied).

208. Defendants are liable for wrongful death of Vaibhav Duggal as their actions caused his suicide.

**COUNT III**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

209. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if set forth herein for sake of brevity.

210. Defendants acted with extreme or outrageous conduct to cause severe emotional distress intentionally or recklessly to Vaibhav and severe emotional distress resulted from their actions.

211. The defendant's conduct was extreme and outrageous as it caused extreme emotional distress to its intended recipient, Vaibhav.

212. Once Defendants received the grievance on Wednesday, July 23, 2025, they immediately started closing ranks.

213. The next two days were spent not gathering facts or ascertaining the veracity of the implied allegations but accentuating and magnifying them amongst leadership ranks with the color commentary of their own personal beliefs. No attempt was made to even contact Vaibhav or get facts from him or other clinical chain of command at the clinic in question. Missing information was simply assumed or implied to engage "Title IX" folks.

214. No reach out to Vaibhav was made until the administration actually concluded that he was to be suspended from clinical rotations without any attempt to gather accurate information.

215. With their action path fully resolved, roles internally assigned (as to who will make the formal request for a referral, and what they will say in that request) and coordinated

by Martins, the administration then intentionally and purposefully set out to put its extremely unjust and outrageous plan in action.

216. Defendants' actions were extreme and outrageous as they:

a. Assigned guilt and blame to Vaibhav without any basis, suspended him from clinical rotations and added an unwarranted context that jeopardized entire medical career and his twenty (20) years of investment in it.

b. Informed him that he was being referred to the Committee on Student Grading and Promotion, the GPC as a disciplinary measure

c. Removed Vaibhav from "all patient care and contact until he meets with GPC" on 8/15/2025 without any due course of law under Article I, § 19 of the Texas Constitution as explained above/

d. Offered no comfort or support or even tacit acknowledgement of his version of facts was being heard even when Vaibhav started showing signs of distress, but instead the Dean "stressed over eight (8)[11] times that he is NOT to have patient contact of any kind in any clinic or hospital – required or of other kind", "that he is on a temporary LOA (leave of absence) with NO patient contact" (see Exhibit 9, Meeting Notes).

e. Warned Vaibhav that the complaint could lead to serious negative outcomes ranging from failing the OB/GYN clinic to dismissal from the program and be placed on his residency letter and refused his request to expedite the hearing date or remove the allegation from the residency letter.

[11] Notes taken during the meeting specifically highlight that Martins "stressed at least eight times"

f. Ignored his assertions that after the follow request, he did not contact the patient in question via text, IM or any other means.

g. Recognized the event as a stressful situation, but made only a per functionary referral to 915-Talk hotline.

h. Disavowed their actions and participation in setting this plan in motion by stating that "Deans of student affairs have no vote in these proceedings"

217. He was also forbidden from making any contact with any member of the GPC and told that an email documenting the meeting would follow.

218. Defendants acted intentionally or recklessly when they:

a. Finally followed up with the promised and dreaded email at 11:36 p.m., almost at mid-night, an extraordinary timing of the e-mail serving no purpose other than to add to distress in isolation, with no recourse to individual, stating that meeting notes of what was discussed were attached, adding a link to student support services and their number, making a reference to the GPAS policy, but it didn't stop there.

b. Summarized the grievance against the clinic as a complaint only against Vaibhav and painted his statement that "he had sent no other message other than request to follow" as "he could not produce anything to flesh out his side of story".

c. Informed Vaibhav that he was not to see any patients in hospitals or clinics, including at any school sponsored events or even as a medical student volunteer.

d. Instructed Vaibhav to make no contact with the patient in any form even though he already asserted he made no contact, and had already blocked her, communicating to him that that his version of the facts was not being believed.

e. Informed him that "The OSA will review your entire academic and professional history since matriculation" with the committee.

f. Warned him that GPC will review the complaint from the OB GYN clerkship and Drs. Toy and Welshans may also address the committee, but he would not be allowed to hear what they had to say, as he will only be invited into the meeting to address the committee ***after*** they address the committee.

g. Recommended that he give his explanation regarding the complaints, specifically asking him to be "accountable" and honest.

h. Assumed guilt and asked him to identify his plan for this never occurring again, suggesting that he "need to have a good plan" that works for him and "be convincing to the GPC that you are sorry this happened and it will never happen again"

i. Again, presuming guilt, asked him to "Humbly request the GPC allow you to start your clinical work again and make up any time while waiting for the investigation."

j. Specifically excerpted and highlighted with bold blue arrows extreme possible outcomes as below.



the student's performance related to other educational program goals and objectives)

- GPC recommendations may include individual remediation*, delayed progression to Year 4, repeat of Year 3, delay of graduation, or dismissal

ies are subject to revision. Refer to the Office of Medical Education Website or contact the Office of Medical ation to ensure that you are working with the current version.



Paul L. Foster School of Medicine

GPC may recommend a formal notation in the professionalism sections on the MSPE

- Refer to policy HSCEP OP 10.20 for requirements regarding criminal record information/updates

219. Associate Dean Martins, even though she was already on notice that Vaibhav was distressed in her meeting and acknowledged that that Vaibhav was being placed in a stressful situation, was presented with physical symptom of "sweaty palms" by a six foot tall man (Vaibhav) in a stressful meeting as a licensed and trained doctor, intentionally subjected Vaibhav to extreme emotional distress. She was on notice that one in three students at TTU were at high risk of suicide, as a medical professional was charged with the knowledge that suicide is number two cause of death in all US deaths in first half life (ages 1-44) surpassing every known disease or cause of death other than accidents from CDC data, that suicide is ***the number one cause of death*** among male medical residents, nonetheless, went to intentionally and recklessly inflict additional emotional distress by sending this charged e-mail in the middle of the night, knowing Vaibhav was waiting for it. Intended to create this distress, even if she did not intend suicide.

220. The conclusion of Vaibhav's guilt and intent to create distress by immediately suspending him from clinical rotations was pre-ordained and intentional choice by Defendants acting in concert, not an outcome of an investigation.

221. Defendant's actions caused the plaintiffs emotional distress and his last writings clearly articulated his state of mind and documented the distress he was under because of defendant's actions.

222. The emotional distress suffered by Vaibhav was severe enough to create the irresistible impulse to take his own life and is evidenced by the fact that:

    a. After receiving the email Vaibhav kept trying to find ways to kill himself to make the pain go away, including searching tallest building in El Paso and location of gun stores.

    b. Vaibhav waited outside the store early morning for store to open to buy the gun.

*223.* It is clear that Defendants intended to inflict this emotional distress.

*224.* The action to suspend Vaibhav before even an investigation was started or even without gathering basic facts from parties that might have relevant knowledge of circumstances around the incident on which grievance was based, such as the Manager of the Clinic, Vaibhav himself, other staff members of the clinic, was a deliberate intentional act, made consciously by Martins, and supported by Reddy, Welshans, Toy, Raya and Frances and defended and validated by remaining defendants.

*225.* Defendants also intentionally denied Vaibhav access to anyone that could help him with the charge or the process pending the GPC determination.

*226.* It is also clearly documented that the decision to suspend was not based on a referral to GPC, but the referral to GPC was requested to support the decision made to suspend Vaibhav.

*227.* It is also undisputably documented that referral thus created to support the draconian decision to suspend acknowledges that the Director of OB/GYN clerkship requesting the referral had been "too busy" to make any inquiry of any kind, yet she felt free to refer and support a punitive measure to in a classic demonstration of "guilty" until proven innocent.

*228.* It is undisputable that Vaibhav believed he was already assumed to be guilty as charged, as the entire message and narrative was about "begging for forgiveness" and "persuading" the committee that it would not be repeated and that he had a corrective plan. The language of the e-mail and the transcript of the meeting with Martins makes it clear that Vaibhav was told that his guilt was a foregone conclusion, and Vaibhav's last writings (his suicide notes) clearly state what he was given to understand.

*229.* Thus the documentation of the message and the documentation of its receipt by Vaibhav clearly align that the intentional message's threat and jeopardy to his entire professional career was perfectly sent and received. (see Exhibit 10, Vaibhav's last note)

*230.* It is logical that such message would create intense emotional distress. It is axiomatic that any young adult that dedicated their entire conscious life in pursuit of a particular challenging and aspiring professional career would be distressed when that career was threatened, especially when there was no rational basis for it.

*231*. Defendants are liable for intentional emotional distress to Plaintiffs by their direct actions or their ratification of actions taken by others.

*232*. Defendants' actions, and their subsequent false extreme and outrageous narrative to Vaibhav's parents after his death, led to additional emotional distress to the parents, bot negligently and intentionally with harm to Vaibhav's career, stature and memory.

*233*. Martins and Lange incorrectly told the parents that Vaibhav conducted the exam, incorrectly asserted that there was inappropriate touching, implied that Vaibhav assumed his guilt and took his life based on guilt when he clearly articulated that was taking his life based on actions of the administration, when documents clearly indicated that he did not conduct the exam, and there was lack of documentation that he was even in the room when the exam occurred (see Exhibit 5, Email from Raya asking Toy to confirm if Vaibhav was in the room)

**COUNT IV**

**Negligent Infliction of Emotional Distress**

234. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if set forth herein for sake of brevity.

235. Under Texas law, negligent infliction of emotional distress is not recognized as an independent cause of action. However, mental anguish damages are recoverable when they arise from the breach of some other legal duty imposed by law. *Boyles v. Kerr,* 855 S.W.2d 593, 595-96 (Tex. 1993). Certain relationships may give rise to a duty which, if breached, would support an emotional distress award. *Id*. at 600.

236. The elements of a negligence claim are (1) a legal duty on the part of the defendant; (2) breach of that duty; and (3) damages proximately resulting from that breach. *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008); *Neighbors Drillings,* U.S.A., Inc. v. Escoto, 288 S.W.3d 401, 404 (Tex. 2009).

237. Defendants breached their duty when they:

   a. Failed to provide adequate supervision during the clinical interaction;

   b. Failed to provide adequate protection to Vaibhav;

   c. Failed to investigate facts before suspension

238. Defendant's failure caused the emotional distress that led to Vaibhav's suicide, and their actions were negligent and performed with a reckless disregard as to whether they were true or accurate, presented with an intent for Vaibhav and his family to rely on them, and they did rely on the actions and information presented.

239. Defendant's failure damaged plaintiffs as it led to

   a. Vaibhav's loss of life due to foreseeable mental crisis created by Defendants' negligent actions.

   b. Emotional distress to family due to Defendants' negligent actions against Vaibhav and the false, prejudicial and reckless narrative that turned out to be largely false conveyed to parents after his death with a reckless disregard to the veracity of the information being presented.

   c. Loss of earning capacity on part of Vaibhav and loss of all investments made into his education by his parents.

240. There was a distinct physical manifestation of the emotional distress/ serious emotional distress where it

    a. created the irrational impulse to take his own life

    b. created the head injury that led to loss of life

241. Defendants are liable to plaintiffs for negligent infliction of emotional distress.

**COUNT V**

**GROSS NEGLIGENCE**

242. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if set forth herein for sake of brevity.

243. Defendants were grossly negligent and breached their duty when they:

    a. Failed to provide adequate supervision during the clinical interaction at the source of the complaint as required by their published policies;

    b. Failed to provide adequate protection to Vaibhav;

    c. Failed to investigate facts before suspension of Vaibhav from all clinical activities, and making a coordinated pre-determination of his punishment and referral to GPC and then seeking a request asking for a referral to GPC to manifest that decision

244. Defendants had actual notice of level of training or lack thereof to the students rotating through the clinics at all times (Exhibit 3a, Sherry Oldfield Email)

245. Defendants had actual notice of lack of insurance by students rotating through the clinical clerkship.

246. Defendants had actual notice of impossibility of direct necessary supervision in the high risk setting of OB/GYN clinic where there were simply not sufficient attendings to supervise the students, where the supervision of students was delegated to non-physician staff such as mid-wives, there were not sufficient mid-wives to directly supervise where students were simply used as cheap labor to conduct tasks well beyond the intended scope of their supervised training as part of their education.

247. Students were not being taught, they were teaching themselves and simply being used by Defendants.

248. There is no documentation of training provided to students on how to conduct the activities they were getting assigned (See Exhibit 3a, Sherry Oldfield Email ), and in fact the manager of the clinic has noted that she is not aware of any such training, and the practice of sending students alone to interact with patients in high risk setting obviously negates the notion of learning by observation.

249. Defendants were grossly negligent when they intentionally and willfully, and in violation of established protocols governing high risk settings and exams that specifically covered the pelvic exam (see Exhibit 14, Policy of Clinical Supervision, excerpted above).

250. Defendants were grossly negligent in exposing both students and the patients by pairing untrained students with live patients with real problems, where students had not yet developed skills necessary to manage difficult interactions or clinical events.

251. Defendant's gross negligence damaged the Plaintiff's by creating emotional distress, financial harm, loss of lime, comfort and companionship.

252. Defendants' actions exposed a highly vulnerable student to extreme risk of emotional distress, including a very high and specific risk for self-harm, that actually manifested in a mental health crisis that led to the student taking his own life.

253. Defendants had actual, subjective awareness of the risks involved based on their research on suicide risks, published CDC Data that they are charged with knowledge of as a medical institution, published JAMA research (as excerpted above) as to risk of suicide in male medical residents but nevertheless proceed with conscious indifference to the rights, safety, or welfare of Vaibhav subjecting him to extreme distress based on a single uninvestigated and facially inconsistent grievance.

254. Defendants are grossly negligent to Plaintiffs

**COUNT VI**

**BREACH OF CONTRACT**

255. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if set forth herein for sake of brevity.

256. American jurisprudence recognizes that a University-Student relationship is essentially contractual in nature, and Texas Courts have held that a school's catalog constitutes a written contract between the educational institution and its patron "The student-college relationship is essentially contractual in nature. "We hold that a school's catalog constitutes a written contract between the educational institution and the patron, where entrance is had under its terms. *Texas Military College v. Taylor*, 275 S.W. 1089 (Tex.Civ.App. -- Beaumont 1925, no writ). *Vidor v. Peacock*, 145 S.W.

672 (Tex.Civ.App. -- San Antonio 1912, no writ) *Univ. of Tex. Health Sci. Ctr.*, 646 S.W.2d 502, 506 (Tex. App.—Houston [1st Dist.] 1982, no writ), also See *Russell v. Salve Regina College*, 938 F.2d 315, 316 (1st Cir.1991). The terms of the contract may include statements provided in student manuals and registration materials. See Lyons, 565 F.2d at 202 " *Mangla v. Brown University*, 135 F.3d 80 (1st Cir. 1997), 84

257. Texas Supreme Court has also ruled that immunity is waived when state enters into contracts.

"However, when the State contracts, the State is liable on contracts made for its benefit as if it were a private person. *State v. Elliott*, 212 S.W. 695, 697-98 (Tex. Civ. App.--Galveston 1919, writ ref'd). Consequently, when [*406] the State contracts with private citizens it waives *immunity from liability*" Fed. Sign v. Tex. S. Univ., 951 S.W.2d 401, 405-06 (Tex. 1997)

258. Texas Supreme Court has also recognized that parties to a contract may breach duties in tort, contract, or both. With respect to contorts, Texas recognizes two tests to determine whether the economic- loss rule bars recovery in tort in the midst of a contractual relationship.[12] First, the "nature of the injury" or "independent injury" test: "When the injury is only the economic loss to the subject of a contract itself [i.e., the benefit of the bargain], the action sounds in contract alone."[13] If the breaching party's

[12] See DeLanney, 809 S.W.2d at 494–95.

[13] Jim Walter Homes, Inc., 711 S.W.2d at 618; see also DeLanney, 809 S.W.2d at 494–95; Mickens v. Longhorn DFW Moving, Inc., 264 S.W.3d 875, 879 (Tex. App.—Dallas 2008, pet. denied).

acts dealt with the subject of the contract, the plaintiff could only recover on the contract, not in tort[14]. Second, the "independent duty" test: whether the breaching party breached an independent duty arising out of the law outside the terms of the contract[15]. If the breached duty was imposed by the contract, the plaintiff's claim sounds only in breach of contract[16]. This test stems from the belief that "[t]ort obligations are in general obligations that are imposed by law— apart from and independent of promises made and therefore apart from the manifested intention of the parties—to avoid injury to others."[17]

259. TTUHSC had a number of formal agreements with Vaibhav including Tuition Agreement, Financial Responsibility Agreement, Student Handbook, Code of Conduct and many other formal and informal agreements that created contractual duties between the parties.

260. TTUHSC breached its implied contract to educate and train Vaibhav in return for applicable tuition fees and academic performance in an appropriate setting as it both failed to provide an appropriate safe setting and suspended him from the rotations without a legitimate reason to do. The suspension was meaningful as it disrupted the scheduled and structured plan for graduation and led to his demise through the stress it generated, and wasted the three years of tuition, housing and other investments.

---

[14] See DeLanney, 809 S.W.2d at 494

[15] See id. (citing W. KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 92, at 655 (5th ed. 1984))

[16] See Jim Walter Homes, Inc., 711 S.W.2d at 618

[17] See id.

261. Since TTUHSC had an implied contract with Vaibhav as an individual to provide him with the necessary training and resources to earn a Doctorate in Medicine in return for payment of its fees maintaining required academic standards it has waived any immunity for the breach of this contract.

262. Vaibhav performed under this contract and paid his tuition and maintained his academic standing with diligence.

263. TTUHSC's breach resulted in damages to Vaibhav where his investment in three years of medical school of over $180,000.00 was impaired, and his future earning capacity was jeopardized and eliminated.

264. Even if Vaibhav had lived, he would have been harmed as his future earning capacity was impaired or at minimum delayed, and he would have been damaged by at least a semester's worth of extra spending to make up for lost clerkship which would have to be repeated.

**COUNT VII**

**RATIFICATION AND RESPONDEAT SUPERIOR**

265. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

266. Defendants Texas Tech University Health and Sciences Center El Paso Paul L. Foster School of Medicine, ratified the acts and omissions of the University, staff and personnel.

267. As a result, the University is responsible for the acts and omissions of staff people who were otherwise responsible for ensuring that the Plaintiff's rights were upheld and protected.

268. The University is thus further liable for the acts and omissions of its employees, contractors, and agents, under the doctrine of Respondent Superior.

**COUNT VIII**

**LIABILITY FOR STATE CREATED DANGER**

269. Plaintiffs reallege and incorporate the preceding paragraphs for sake of brevity.

270. Defendants are also liable under the state created danger doctrine.

271. TTUHSC failed to provide adequate procedural safeguards or that the procedures in place were systematically ignored and their actions created or increased danger to Vaibhav's safety

272. "To establish liability under this doctrine, a plaintiff must demonstrate that state actors used their authority to create a dangerous environment, acted with deliberate indifference to the plaintiff's plight, and created an opportunity for harm that would not have otherwise existed. The environment must be dangerous, the state actors must have known of the danger, and their actions must have specifically endangered the individual rather than the public at large". *Wood County v. Rivers* 51 SW 3d 626 - Tex: Court of Appeals, 12th Dist., 2000 -

273. There were multiple affirmative acts by TTUHSC that created or increases the risk of harm and created a special danger to the Vaibhav and other students like him.

274. This risk was a specific risk distinct from the risk to general public as medical students were required to be in this clinic to complete their education and were reasonably expected to have adequate protection and supervision, that they were paying for in form of tuition.

275. These risks were recognized and have been documented by first level management at the clinics, but were ignored or suppressed by their superiors. (*see* Exhibit 3a pg. 2, para 3)

276. TTUHSC was deliberately indifferent to the plight of students in such high-risk clinics, which is different from other general practice clinics and their callous indifference is equated with subjective recklessness as they were aware of facts indicating a substantial risk of serious harm and consciously disregarding that risk. See *Leo v. Trevino*.

277. Defendants placed Vaibhav and other students like him in a clinical setting where they were exposed to not just complaints, but other risks from seeing patients without adequate training and adequate supervision. In a clinical setting certain areas are designated as high risk, where students are not allowed to be alone or exposed to patients by themselves, Emergency Rooms, Operating Rooms, Obstetrics and Gynecology are general considered such high-risk areas. Vaibhav, as a male medical student was unduly exposed to high risks in the Ob/Gyn clinics when asked to perform the intakes alone with the patients, as specific risk that fully manifested in his case, eventually leading to loss of his life.

**COUNT IX**

**NEGLIGENT SUPERVISION**

278. Plaintiffs reallege and incorporate the preceding paragraphs for sake of brevity .

279. Defendants' actions alleged in General negligence, gross negligence also support a claim of negligent supervision as Vaibhav was unsupervised during the alleged incident and had no guidance or training to support him

280. Defendants were negligent in their supervision on multiple fronts. Reddy, Welshans and Toy were negligent in supervising Vaibhav and the patient to ensure that conversations outside the scope of examination that may be uncomfortable to either party were quickly shutdown or contained or alternatively explain to patient why questions were pertinent and necessary.

281. Defendants Talia Raya, Samantha Belletete, Maureen Francis, Charmaine Martins, Eugene Toy and Katelyn Welshans were negligent in supervising the processes they were invoking and went to extreme set of assumptions driven by self-preservation and self-created delays without any temperance or thoughtfulness in executing the process.

282. Defendants Lange and TTUHSC were negligent in their supervision of Martins, Welshans, Toy and Reddy in ensuring that they were not just following the forms of processes they were choosing to invoke but also their substance and intent.

283. The same defendants also failed to ensure that they had properly qualified personnel in the roles they were assigned, not just people that were willing to take that role because no one else was willing to do it, as in Clerkship Director or someone was

willing to do it but lacked the requisite skill set to fulfill the responsibilities of that role, as in case of Martins.

**COUNT X**

**CIVIL CONSPIRACY**

284. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if set forth herein for sake of brevity.

285. Additionally and in the alternative, to the extent Defendants Welshans, Martins, Francis and Toy acted in their individual capacities, they conspired together to deprive Vaibhav of his due course of law under Article I, § 19 of the Texas Constitution rights, inflicted emotional distress intentionally or negligently leading to his wrongful death.

286. Defendants Welshans, Francis, Martins and others conspired to deprive Vaibhav of any due course of law under Article I, § 19 of the Texas Constitution, by coordinating and orchestrating a sham referral request, based on a pre-meditated outcome, without any fact finding, suspending him from clinical rotations and patient contact, presuming guilt and directing him to humbly beg for forgiveness.

287. Defendants conspired to inflict emotional distress and succeeded in creating a emotional distress that led to a mental health crisis that resulted in the physical manifestation of Vaibhav's death, depriving him of his dreams and career, causing him and his parents to lose their investment in his education and depriving his parents of companionship of their son.

**COUNT XI**

**ULTRA VIRES (TEXAS LAW)**

288. **Ultra Vires Acts (Declaratory and Injunctive Relief).** Defendants acted ultra vires by exercising authority they did not possess and by failing to comply with mandatory statutory and policy-based duties. Specifically, Defendants:

A) Ignored mandatory investigation procedures;

B) Imposed discipline not authorized absent investigation and findings;

C) Circumvented grievance and misconduct adjudication processes;

**D)** Misused disciplinary authority to punish without legal basis.

289. Plaintiffs seek declarations that Defendants' actions were unlawful and injunctions preventing similar conduct in the future for similarly situated students, as well as expunction of any tarnish on Plaintiff's record or reputation.

**COUNT XII**

**DISCRIMINATION**

290. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if set forth herein for sake of brevity.

291. Defendants discriminated against Vaibhav as a minority male by assigning unwarranted guilt and blame in face of a complaint of discomfort by a white female patient, suspending him from his clinical rotations without any due course of law under Article I, § 19 of the Texas Constitution, in violation of their written policies.

292. Defendants violated Vaibhav's rights under the Texas Constitution by illegally discriminating against him.

**JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable and the jury fee is paid herewith.

**Statutory Notice under Tex. Civ. Prac. & Rem. Code § 101.101**

Plaintiffs provided statutory notice under Tex. Civ. Prac. & Rem. Code § 101.101, or alternatively, Defendants had actual notice of the claims.

**ATTORNEY FEES**

Plaintiffs request reasonable and necessary attorney fees, costs, and expenses incurred in this action, including all fees for trial and through any potential appeals for every cause of action for which attorney fees are authorized under law.

**PUBLIC POLICY CONSIDERATIONS**

**Important Final Note.** There is a severe shortage of Doctors in United States as the intellect, training and resource required for a medical degree are extremely taxing. The shortage ins severe enough, that Texas legislature in September 2025, passed the DOCTOR ACT (House Bill 2038) which allows foreign medical graduates to practice medicine in Texas without requiring them to go through the residency training in USA so that the significant shortage of healthcare services can be addressed. Yet, at the same time, TTUHSC, directly acting against the stated policy of State of Texas, as public medical school has secretly decided guilt, suspended a student without investigation, threatened career destruction, ignored known suicide risks, and cannot be allowed to escape judicial review. Loosing precious lives like Vaibhav Duggal directly contravenes the policy of State of Texas reflected in the DOCTOR ACT.

TTUHSC has over the course of last two years alone suspended additional medical students, some of which have led to litigation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

A. Plaintiffs seek declaratory and prospective injunctive relief under Texas state law against individual Defendants in their official capacities for actions taken in violation of Texas law without legal authority, including but not limited to:

    a. Imposing disciplinary sanctions without conducting the mandatory investigation required by TTUHSC policies;

    b. Suspending a medical student from clinical rotations without notice, investigation, or hearing;

    c. Referring Vaibhav Duggal for "egregious" misconduct without factual basis or compliance with governing procedures;

    d. Acting in direct contravention of TTUHSC's Institutional Handbook, Ambulatory Clinic Policy EP 6.6, and Grading, Promotion, and Academic Standing policies.

B. expunction of any and all wrongful accusations and unlawful disciplinary action against him by TTUHSC.

C. awarding contractual, compensatory, punitive, exemplary, and other recoverable damages;

D. for loss of society, affection, and companionship, funeral expenses and other losses

E. as allowed under Texas law for wrongful death;

F. pain and suffering damages for Vaibhav Duggal and punitive damages under Texas law;

G. for the survivor action;

H. for damages to which the decedent would have been entitled if he had survived;

I. exemplary damages relative to any and all causes of action plead now or in future that allow Plaintiffs to recover such, also Plaintiffs Explicitly request exemplary damages under Texas Civ. Practice & Rem. Code §41.003;

J. Plaintiffs seek all available damages against Defendants in their official capacity and/or individual capacity, but do not seek double recovery.

K. awarding reasonable attorney's fees and expenses in this action and any appeals thereof;

L. awarding pre-judgment and post-judgment interest; and

M. awarding such other and further relief as this Court may deem just and proper.

Respectfully submitted,

The Sanjay R Chadha Law, PLLC.
By
*/s/ Sanjay R Chadha*
Sanjay R Chadha
Texas Bar No. 00795287
Daniel A. Ardmore
Texas Bar No. 24142224
808 Travis St, Suite 100
Houston, Texas 77002
(866) 818-2328

srchadha@reachalaw.com
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of Plaintiffs Amended Complaint served through the Court's ECF on March 20, 2026 to:

**Sheaffer K. Fennessey**
Assistant Attorney General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
shea.Fennessey@oag.texas.gov

**Kevin D. Molina**
**Assistant Attorney General**
300 West 15th Street, 12th Floor,
Austin, Texas 78701
e-mail: kevin.molina@oag.texas.gov

*/s/ Sanjay R Chadha*
Sanjay R Chadha